UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ALBERT A. ROSS,

                              Plaintiff,                    11 Civ. 8530 (PKC)

               -against-
                                                           MEMORANDUM AND ORDER
LLOYDS BANKING GROUP, PLC, f/k/a
LLOYDS TSB GROUP, plc; SIR VICTOR
BLANK, Chairman of Lloyds; and ERIC
DANIELS, Chief Executive of Lloyds,

                              Defendants.
-------------------------------------------------------------x
P. KEVIN CASTEL, District Judge:

          Plaintiff Albert A. Ross brings this putative class action, alleging that the

defendants committed securities fraud when they misstated and omitted material information

regarding the acquisition of Halifax Bank of Scotland ("HBOS") by defendant Lloyds

Banking Group, PLC ("Lloyds").  Plaintiff asserts a claim pursuant to Section 10(b) of the

Securities Exchange Act of 1934 (the "'34 Act"), 15 U.S.C. § 78u-4(b), and Rule 10b-5

promulgated thereunder, 17 C.F.R. § 240.10b-5, as well as a claim of control-person liability

under Section 20(a), 15 U.S.C. § 78t(a).

          Defendants now move to dismiss the First Amended Complaint (the

"Complaint").  (Docket # 27.)  They argue that the Complaint does not raise a strong

inference of scienter, and that it therefore fails to satisfy the pleading threshold of the Private

Litigation Securities Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b)(2), and Rule

9(b), Fed. R. Civ. P.  Defendants also argue that the Complaint does not allege actionable

misstatements or omissions, fails to allege loss causation and that all claims are time-barred.

Because the Complaint does not plausibly allege that defendants are liable for material misstatements or omissions and because it fails to raise an inference of scienter, the defendants' motion is granted.  I need not reach defendants' other arguments.

BACKGROUND

For the purpose of the defendants' motion, all nonconclusory factual allegations are accepted as true.  S. Cherry St. LLC v. Hennessee Group LLC, 573 F.3d 98, 100 (2d Cir. 2009); see also Ashcroft v. Iqbal, 556 U.S. 662 (2009).  As the non-movant, all reasonable inferences are drawn in favor of the plaintiff.  Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 107 (2d Cir. 2012).

A.  The Lloyds Acquisition of HBOS.

Plaintiff is an individual domiciled in St. Tammany Parish, Louisiana. (Compl't ¶ 9.)  He owned more than 10,000 American Depositary Receipts ("ADRs") of Lloyds.  (Compl't ¶ 9.)  Each Lloyds ADR represents the right to receive four shares of Lloyds stock, and the ADRs trade in an efficient market on the New York Stock Exchange. (Compl't ¶¶ 6, 141-42.)  The Complaint purports to bring claims on behalf of all persons and entities who purchased Lloyds ADRs from September 18, 2008 to February 27, 2009 (the "Class Period").  (Compl't ¶ 25.)  Defendant Sir Victor Blank was Lloyds chairman during the Class Period, and defendant Eric Daniels was its chief executive.  (Compl't ¶¶ 7-8.)

On September 18, 2008, Lloyds announced that it had reached an agreement to acquire HBOS, pursuant to which HBOS shareholders would receive 0.83 shares of Lloyds for each HBOS share.[1]  (Compl't ¶¶ 10, 53.)  The Complaint asserts that in the years preceding the financial crisis of 2008, HBOS expanded aggressively but did not maintain a

_____

[1] On October 13, the terms of the transaction were revised, with HBOS shareholders given .605 Lloyds shares for each HBOS share.  (Compl't ¶ 66.)

suitable base of customer deposits.  (Compl't ¶¶ 47-49.)  According to plaintiff, by mid-September 2008, HBOS was "on the brink of collapse."  (Compl't ¶ 51.)  Because of significant economic turmoil in the financial sector and concern that its "severe liquidity crisis" threatened HBOS with failure, regulators in the United Kingdom (the "UK") approved the acquisition by Lloyds, despite previous opposition to such a transaction.  (Compl't ¶¶ 11-12.)

B.  UK Government Assistance to Bolster HBOS Liquidity.

According to plaintiff, beginning on October 1, 2008, HBOS was unable to meet its obligations and lacked liquidity.  (Compl't ¶ 71.)  Throughout 2008, the UK government was implementing new measures in hopes of stabilizing the nation's financial services sector.  As characterized by plaintiff, on October 1, the Bank of England "secretly agreed" to extend £25 billion in Emergency Liquid Assistance (the "ELA") to HBOS.  (Compl't ¶¶ 20, 73.)  The Complaint distinguishes the ELA aid package from a separate government program that HBOS also used, the Specialized Liquidity Scheme ("SLS").  (Compl't ¶ 18.)  The Complaint acknowledges that Lloyds and HBOS expressly disclosed participation in the SLS, representing that, among other things, the SLS provided financial institutions "additional flexibility."  (Compl't ¶¶ 54-55.)  Plaintiff asserts that the market erroneously believed that the SLS satisfied HBOS's liquidity needs and ensured its solvency.  (Compl't ¶ 57.)

By contrast, the Complaint alleges that the ELA package was undisclosed, and imposed harsh borrowing terms on HBOS.  Plaintiff asserts that the ELA charged an interest rate two percent above the market, and that to receive the ELA, HBOS was required to post collateral amounting to 50-60 pence per pound of government assistance.  (Compl't ¶¶ 20, 72,

74, 77.)  According to the plaintiff, absent the undisclosed ELA intervention, HBOS would

have collapsed.  (Compl't ¶¶ 21, 76.)  Lloyds and HBOS publicly announced HBOS's

participation in government assistance measures on October 13, 2008, but did not disclose the

ELA package during the Class Period.  (Compl't ¶¶ 14, 20-21.)  According to the Complaint,

the ELA funds to HBOS were "repaid through other sources on January 16, 2009," but peaked

on November 13, 2008 at £25.4 billion.  (Compl't ¶ 71.)  In public statements, including

testimony before the UK Parliament, Lloyds executives "suggested" that because the public

was aware that HBOS received aid under the SLS it did not need to disclose assistance under

the ELA.  (Compl't ¶ 74.)  Plaintiff also asserts that HBOS did not disclose that it received

$11.5 billion in assistance from the United States Federal Reserve Bank.  (Compl't ¶ 80.)

C.  Alleged Material Misstatements and Omissions Made By Defendants.

On October 13, 2008 Lloyds announced that it would participate in "a

comprehensive set of measures" announced by the UK government, but did not cite ELA aid

to HBOS.  (Compl't ¶ 14.)  Lloyds executives also made public statements asserting that

HBOS was financially stable and that Lloyds was acquiring HBOS at a significant discount.

(Compl't ¶¶ 14-15.)  Defendant Eric Daniels, chief executive at Lloyds, stated that in

purchasing HBOS, Lloyds was acquiring £30 billion in assets at a price of £14 billion.

(Compl't ¶ 88.)  As characterized in the Complaint, in its public filings Lloyds stated that

there had been no material change in HBOS finances since mid-2008 and that all of HBOS's

material contracts had been disclosed.  (Compl't ¶ 16.)

According to plaintiff, Lloyds's public statements "were false and misleading

in several respects."  (Compl't ¶ 17.)  He alleges that defendants were aware that HBOS had a

"substantially inferior" book value, and that Lloyds management intentionally concealed

HBOS participation in the ELA.  (Compl't ¶¶ 87-92.)  Plaintiff cites to several alleged

misrepresentations concerning the business strengths of HBOS, including assertions that the

acquisition allowed for "a robust capital and liquidity position" and "very strong liquidity."

(Compl't ¶¶ 94, 105-08.)  Defendants also stated that Lloyds was not "critically dependant"

on financial assistance from the UK government.  (Compl't ¶ 94.)  Other alleged

misrepresentations cited by plaintiff include assertions that Lloyds diligence of HBOS went

"as predicted," statements that Lloyds executives felt "very good" about the HBOS

acquisition, and statements that the acquisition was "a good deal" that "just got better for

Lloyds."  (Compl't ¶ 95; see also Compl't ¶ 105, 109.)

   Plaintiff alleges that Lloyds also falsely stated that HBOS had £60 billion in

liquid reserves, when, in reality, the £60 billion figure reflected illiquid holdings of

government debt and unsecured consumer loans.  (Compl't ¶ 17, 79, 94.)  By definition,

plaintiff asserts, none of these holdings was liquid.  (Compl't ¶ 17.)  Plaintiff also alleges that

HBOS's holdings included billions of pounds of "bad debt," and that defendants overstated

the book value of the HBOS portfolio.  (Compl't ¶ 18.)

   The Complaint also discusses a document identified as a "shareholder circular"

that was filed with the SEC on November 3, 2008.  (Compl't ¶¶ 96-105, 108.)  Plaintiff

alleges that the circular falsely stated that HBOS finances had not significantly changed since

June 30, 2008, when HBOS last published its financial statements, even though HBOS had

lost £10 billion in that period.  (Compl't ¶¶ 98-100.)  Plaintiff asserts that in its summary of

government funding measures, the circular omitted all material information concerning the

ELA.  (Compl't ¶¶ 101-03.)  In a document described as an Open Offer Prospectus and in a

separate letter to Lloyds shareholders, defendants again failed to mention ELA funding.

(Compl't ¶¶ 110-16.)

> D.  Plaintiff's Allegations of Loss Causation and the Purported Corrective Disclosures.

Plaintiff alleges that from December 2008 through February 2009, defendants "dribbled out bad news" about HBOS, ultimately disclosing that it would "write off £10 billion in bad debt, and that it would move £35 billion of treasury assets previously booked as 'available for sale' to 'loans and receivables' in order to avoid further write-offs."  (Compl't ¶ 22.)  According to the plaintiff, when the market learned the truth about HBOS's financial condition, Lloyds share price "dropped precipitously."  (Compl't ¶ 23.)

On February 13, 2009, Lloyds reported that HBOS lost £11 billion in 2008, along with a £7 billion impairment charge for bad loans.  (Compl't ¶ 127.)  The Complaint asserts that from February 12 to February 17, the price of Lloyds ADRs dropped from $5.33 to $2.99, a decline of 44 percent.  (Compl't ¶ 139.)  As characterized in the Complaint, on February 27, Lloyds "confirmed" that HBOS had £10.8 billion in pre-tax loss and stated that it had been "plagued" by £9.9 billion in bad loans, leading to a 44 percent decline in the value of Lloyds ADRs.  (Compl't ¶ 139.)

MOTION TO DISMISS STANDARD.

Pursuant to Rule 12(b)(6), Fed. R. Civ. P., "[t]o survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (quoting Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atlantic

Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "'The Supreme Court has held that, to maintain a private damages action under § 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" Acticon AG v. China N.E. Petroleum Holdings Ltd., 692 F.3d 34, 37 (2d Cir. 2012) (quoting Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP, 603 F.3d 144, 151 (2d Cir. 2010)).

"A complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b) by stating with particularity the circumstances constituting fraud." Slavton v. Am. Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010).  The PSLRA requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  This pleading threshold gives a defendant notice of the plaintiff's claim, safeguards a defendant's reputation from "improvident" charges and protects against strike suits.  See ATSI Commc'ns, Inc. v. Shaar Funds Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Id. at 99 (citing Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)).

As the Second Circuit has repeatedly required, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity

why and how that is so." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004); accord ATSI, 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient.").

Rule 9(b), Fed. R. Civ. P., for its part, requires a party to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Allegations of fraud may be "too speculative even on a motion to dismiss," particularly when premised on "'distorted inferences and speculations.'" ATSI, 493 F.3d at 104 (quoting Segal v. Gordon, 467 F.2d 602, 606, 608 (2d Cir.1972)). "The [PSLRA] insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(l), (2)).

The PSLRA also "requires plaintiffs to state with particularity . . . the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n. 12 (1976)). To qualify as "strong," the "inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314.

DISCUSSION

I.      The Complaint Does Not Plausibly Allege Material Misstatements or
        Omissions.

Rule 9(b) requires a complaint to "specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements

were made, and (4) explain why the statements were fraudulent."  ATSI, 493 F.3d at 99.  As

noted, in claiming fraud, a plaintiff "must demonstrate with specificity why and how"

defendants' statements were false and misleading.  Rombach, 355 F.3d at 174.  Allegations of

fraud may be "too speculative even on a motion to dismiss," particularly when premised on

"'distorted inferences and speculations.'"  ATSI, 493 F.3d at 104 (quoting Segal v. Gordon,

467 F.2d 602, 606, 608 (2d Cir. 1972)).  "[E]xpressions of puffery and corporate optimism do

not give rise to securities violations."  Rombach, 355 F.3d at 174.  When a plaintiff challenges

as fraudulent a statement of opinion – as opposed to a statement of objective fact – the burden

is on the plaintiff to plausibly allege that the speaker did not truly hold that opinion.  City of

Omaha, Neb. Civilian Emp. Ret. Sys. v. CBS Corp., 679 F.3d 64, 67-68 (2d Cir. 2012).

>    For the following reasons, the Complaint does not plausibly allege fraudulent
misstatements and omissions by the defendants.

### A.   The Broad, Optimistic Generalizations Cited by Plaintiff Are Non-Actionable.

>    The Complaint does not plausibly allege actionable misstatements or

omissions.  Many of the purported misstatements recited in the Complaint consist of broad,

optimistic generalizations about the benefits of the acquisition.  These include

characterizations that the acquisition was "a fantastic deal" and "a great deal for

shareholders;" statements that the combined entity would have "very strong liquidity;" and

assertions by Daniels that "[w]e feel very good about the deal," that Lloyds runs a "very

prudent funding book," that Lloyds would take a "prudent risk stance" and that the transaction

ultimately would cause "a huge increase in net asset value" (Compl't ¶¶ 13, 15, 54, 56, 69-70,

94, 95, 124.)  Plaintiff also cites a statement by defendant Blank in a January 20, 2009

interview with Sky News, in which he stated, "I believe that everything is out there as far as

HBOS is concerned, they've made I think three or four public statements over the course of the last year explaining exactly what their financial position is."  (Compl't ¶ 125.)

As noted in ECA, Local 134, 553 F.3d at 206, "generalizations" regarding "business practices" do not "amount to a guarantee" to shareholders.  "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects."  Novak. 216 F.3d at 309.  Statements by Daniels concerning the Lloyds emphasis on prudence are non-actionable generalizations about company business practices.  See ECA, Local 134, 553 F.3d at 206.  Other statements characterizing the acquisition as "fantastic" and "great deal," one that made Lloyds "feel very good," were optimistic, broad statements about the transaction, not concrete statements of knowable fact.  See Novak, 216 F.3d at 315; see also Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999) ("overly optimistic disclosures" are not actionable).  As with each of those statements, the characterization that the combined entity would have "very strong liquidity" was an opinion, and the Complaint does not plausibly allege that the opinion was not sincerely held.  City of Omaha, 679 F.3d at 67-68.  Moreover, that statement was directed to the combined liquidity of Lloyds and HBOS, not merely HBOS standing alone.  Blank's statement that he "believe[d] that everything is out there as far as HBOS is concerned" also constitutes a statement of opinion.  Id.  Moreover, the Complaint includes no context for Daniels's reference to "exactly what their financial position is" at HBOS.  (Compl't ¶ 125.)  The "financial position" could refer to any number of topics, and this context-free quotation, without more, does not plausibly allege a material misstatement.

The statements in paragraphs 13, 15, 54, 56, 69-70, 94, 95 and 124-25 are non-actionable.  As for the balance of the statements in the Complaint, they do not state claim for relief for the reasons addressed below.

  B. Plaintiff Does Not Plausibly Allege that the Statement Concerning HBOS Liquidity Was Misleading.

Plaintiff asserts that defendants' September 18, 2008 statement concerning liquidity at HBOS was false and misleading.  As noted, the Complaint alleges that at the time that the acquisition was announced, defendants stated that HBOS had £60 billion in liquid reserves; plaintiff alleges that these holdings were illiquid, and consisted of government debt and unsecured loans.  (Compl't ¶¶ 17, 79, 94.)

Upon careful review of the Complaint, this Court is unable to find any allegation identifying the speaker who allegedly uttered the representation of £60 billion in liquidity, or any context concerning when and where the remark was made.  However, in an exhibit annexed to defendants' motion, a non-party individual named Truett Tate, identified as "Group Executive Director, Wholesale and International Banking of Lloyds," is quoted in an investor call as stating that HBOS held "roughly" £60 billion in near-term liquid reserves.  (Edwards Dec. Ex. M at 2, 9.)  Plaintiff cites to this exhibit in opposition to the motion.  (Opp. Mem. at 2 n.2.)  The Complaint does not mention Tate or set forth any basis to impute his remarks to defendants.  Without explanation or supporting allegations, it merely attributes this allegedly fraudulent misrepresentation to the parties in this action.  The Complaint therefore fails the basic threshold requirements for alleging fraud, including the obligations to specify the fraudulent statement, identify the speaker, allege when and where the statement was made and explain why the statements were fraudulent.  ATSI, 493 F.3d at 99.  This remark does not plausibly support a securities fraud claim.

Even if the statement of a non-party could be imputed to the defendants, the Complaint does not allege facts showing that any defendant had actual knowledge that this statement was false at the time that it was made.  In conclusory fashion, the Complaint alleges that HBOS's receipt of ELA funds establishes that the representation concerning liquidity was knowingly false, and cites to a 2011 letter to Lloyds shareholders discussing bond portfolios and non-securitized HBOS loans.  (Compl't ¶ 79.)  But plaintiff does not explain how the receipt of ELA funds would plausibly mean that an institution was illiquid.  He alleges that another financial institution, Northern Rock, experienced a "run on the bank" after ELA participation was disclosed, whereas disclosure of SLS aid "did not create panic" on the part of banks' depositors or shareholders.  (Compl't ¶¶ 38-42, 45.)  Plaintiff alleges that a second institution, the Royal Bank of Scotland, received ELA aid when it reached "the point of failure . . . ."  (Compl't ¶ 84.)  But retrospective knowledge of other financial institutions' conditions does not support an allegation as to HBOS's own liquidity levels.  The Complaint does not plausibly allege that the label "Emergency Liquid Assistance" speaks to the specific liquidity reserves of an institution, or that the receipt of such assistance contradicts Tate's representation of HBOS liquidity.  More importantly, the receipt of ELA funds and the scope of HBOS's unsecuritized holdings do not render any liquidity-related statement by Tate knowingly false at the time that it was uttered.

The Complaint fails to plausibly allege that any defendant misrepresented HBOS's liquid reserves.

C.  Plaintiff Does Not Plausibly Allege that the Shareholder Circular Was Misleading.

Plaintiff asserts that defendants committed securities fraud when the "shareholder circular" of November 3, 2008 stated that "there has been no significant change

in the financial or trading position" of HBOS since June 30, 2008, the date of its last

published financial statements.  (Compl't ¶ 98; see also Edwards Dec. Ex. F at 266.)  The

Complaint selectively quotes from this portion of the shareholder circular, omitting language

stating that, except for sections headed Group Overview, Divisional Review and Outlook,

there was "no significant change" in HBOS trading or financial positions.  (Edwards Dec. Ex.

F at 266.) [2]  These qualifying sections of the shareholder circular included the following

disclosures:

> That in the nine months preceding the end of September 2008, HBOS profitability had been affected by higher impairments, negative adjustments to treasury portfolio, the sale of an entity called BankWest and short-term fluctuations in investment returns.  It also noted "deposit outflows" in September and October.  (Edwards Dec. Ex. F at 271.)
>
> That HBOS performance had been affected by higher impairments, including an impairment charge of £1.721 billion taken on September 30, 2008.  It noted that secured lending arrears "have risen broadly," and that unsecured lending arrears also rose.  The "Corporate credit environment has deteriorated," the circular states.  The circular stated: "The third quarter charge reflects a significant increase in the collective provision in view of the worsening economic outlook."  (Edwards Dec. Ex. F at 272.)
>
> That "the credit environment will remain challenging," with the "robust capital position" of HBOS "further enhanced by the injection of capital and liquidity facilitated by the UK Government."  (Edwards Dec. Ex. F at 273.)

Thus, the shareholder circular expressly included acknowledgments that HBOS, in the

preceding months, had taken impairment charges and sold certain assets.  It disclosed that

HBOS intended to accept an "injection" of "liquidity" from the UK government.  It stated that

---

[2] "[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment."  Holowecki v. Fed. Express Corp., 440 F.3d 558, 565-66 (2d Cir. 2006) (alterations in original; quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)).

HBOS anticipated ongoing losses due to "the worsening economic outlook." The purported misleading statement about the lack of change in HBOS finances was, therefore, expressly conditioned on acknowledgment of recent charges, fluctuations and a planned injection of government liquidity. Plaintiff has not plausibly alleged that the circular contains a misstatement of material fact.

> D. Plaintiff Does Not Plausibly Allege that the Failure to Disclose the ELA
>    <u>Package Was a Material Omission.</u>

Finally, several of the Complaint's allegations are directed toward the non-disclosure of the ELA package.

"Under section 10(b) and Rule 10b-5, 'an omission is actionable under the securities laws only when the buyer is subject to a duty to disclose the omitted facts.'" <u>S.E.C. v. DiBella</u>, 587 F.3d 553, 563 (2d Cir. 2009). "For an undisclosed fact to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." <u>Castellano v. Young & Rubicam, Inc.</u>, 257 F.3d 171, 180 (2d Cir. 2001) (quotation marks omitted). If a development renders a past statement misleading, the failure to disclose that development may be a material omission. <u>In re Time Warner Sec. Litig.</u>, 9 F.3d 259, 267-68 (2d Cir. 1993). An omission also may be actionable if a defendant has an affirmative legal duty to disclose, such as a duty set forth by statute or regulation. <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d 347, 360 (2d Cir. 2010).

Here, while contending that the ELA funding was unique compared to other forms of government assistance administered to HBOS and Lloyds, the Complaint does not allege that receipt of ELA funding itself caused loss to Lloyds shareholders. Rather, plaintiff's theory of liability is that disclosure of the ELA would have informed shareholders

of the true scope of losses within HBOS.  Plaintiff contends that a disclosure obligation arose through past Lloyds statements announcing certain government support, which were rendered misleading by HBOS's acceptance and non-disclosure of ELA funding.

Although it did not announce the ELA funding, Lloyds made public the fact that it was receiving substantial government assistance both for itself and HBOS, and that they required governmental liquidity to maintain operations.  On October 13, 2008, Lloyds announced that it was participating in numerous measures initiated by the UK government, including continuation of SLS funding, and programs known as the Bank Recapitalisation Fund and the Credit Guarantee Scheme.  (Compl't ¶¶ 14, 76.)  The Complaint asserts that the Bank of England "secretly agreed" to provide ELA support on October 1.  (Compl't ¶ 20.)  It alleges that the ELA package "differed in several significant respects" from SLS and other government measures by imposing higher interest rates than the SLS and the prevailing market rates, and that the UK government required larger amounts of HBOS collateral under the ELA.  (Compl't ¶ 20.)

But, as noted, plaintiff's theory of fraud is not that the ELA harmed shareholders, but that its disclosure would have revealed other problems within HBOS, particularly its declining liquidity.  In plaintiff's view, had shareholders been on notice of the ELA, they also would have been on notice of HBOS struggling conditions.  (Compl't ¶¶ 109 (alleging defendants' awareness of ELA and "exact reasons HBOS was required to resort to ELA . . . ."), 115 (alleging that a "statement did nothing to inform the investing public about the true state of HBOS's financial affairs" because it omitted mention of ELA package); 131 (alleging that the market "would have known immediately" about "the poor quality of HBOS's assets" if the ELA had been disclosed).

This theory of fraud neglects that Lloyds and HBOS disclosed the necessity of government funding and acknowledged the adverse effect on their solvency if the funding became unavailable.  The shareholder circular stated that "[i]n order to meet their funding obligations," Lloyds and HBOS would "rely" on "Bank of England liquidity facilities," among other sources.  (Edwards Dec. Ex. F at 33.)  The circular stated that HBOS's "robust capital position" would be "enhanced by the injection of capital and liquidity facilitated by the UK Government," which would "reinforce[]" the ability of the combined Lloyds-HBOS entity "to meet" the "challenging" credit environment.  (Edwards Dec. Ex. F at 273.)  The Lloyds prospectus of November 2008 expressly stated that the combined entity required a liquidity infusion from UK government sources.  It stated:

> The Lloyds TSB Group expects that the Enlarged Group will substantially rely for the foreseeable future on the continued availability of Bank of England liquidity facilities as well as HM Treasury's guarantee scheme for short- and medium-term debt issuance.  If the Bank of England's liquidity facility, HM Treasury's guarantee scheme or other sources of short-term funding are not available after that period, the Lloyds TSB Group, or the Enlarged Group, could face serious liquidity constraints, which would have a material adverse effect on its solvency.

(Edwards Dec. Ex. G at 13.)

The Complaint fails to allege an actionable omission.  First, there is no allegation that defendants were under an affirmative obligation pursuant to a statute, SEC regulation or other type of rule to disclose funding under the ELA program.  In re Morgan Stanley, 592 F.3d at 60.  Second, the Complaint does not plausibly allege that a disclosure of ELA support was required to render past statements not misleading.  See In re Time Warner, 9 F.3d at 267-68; see also Richman v. Goldman Sachs Grp., Inc., __ F. Supp. 2d __, 2012 WL 2362539, at *5-6 (S.D.N.Y. June 21, 2012) (no obligation to disclose new SEC notice of

investigation when company previously disclosed ongoing government investigations into same matters).  Defendants disclosed HBOS's reliance on government support to maintain liquidity, and plaintiff does not plausibly allege that informing shareholders of ELA funding by name would have materially altered the total mix of information.  "An omission is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).  At the pleading stage, the Court assumes that a reasonable investor would have considered it material that HBOS relied on government financial assistance to maintain its liquidity.  However, Lloyds disclosed in public statements that HBOS was reliant on government funding to maintain liquidity and that its withdrawal could threaten the solvency of the combined entity.  The Complaint does not plausibly allege that a reasonable shareholder would have viewed specific disclosure of ELA funding as having significantly altered the total mix of information already available to the public.

The Complaint therefore does not plausibly allege that the non-disclosure of ELA funding was a material omission.

II.     The Complaint Does Not Raise a Cogent and Compelling Inference of Scienter.

Defendants argue that the Complaint fails to allege an inference of scienter under Rule 9(b) and the PSLRA.  There are two states of mind that may constitute scienter.  One is "conscious misbehavior," arising from conduct that would benefit the defendants "in some concrete and personal way."  ECA, Local 134, 553 F.3d at 198.  Alternatively, a plaintiff may plead scienter with "strong circumstantial evidence" of recklessness.  ATSI, 493

F.3d at 99.  The Second Circuit has stated that "securities fraud claims typically have sufficed

to state a claim based on recklessness when they have specifically alleged defendants'

knowledge of facts or access to information contradicting their public statements.  Under such

circumstances, defendants knew or, more importantly, should have known that they were

misrepresenting material facts related to the corporation."  Novak, 216 F.3d at 308.  Such

recklessness is "an extreme departure from the standards of ordinary care . . . ."  Id.  The

Complaint appears to proceed under a recklessness theory of scienter,[3] asserting that the

defendants intentionally failed to disclose material facts concerning the ELA.  (Compl't ¶¶

87-90.)

        The Complaint does not raise an inference of scienter, one that is at least as

compelling as a competing inference of non-fraudulent intent.  Tellabs, 551 U.S. at 314.  The

allegations directed to knowledge possessed by defendants Bank and Daniels is thin, and

premised on conclusory assertions that these two defendants were "intimately familiar with all

facets" of the transaction.  (Compl't ¶¶ 7-8.)  The Complaint alleges in conclusory fashion

that defendants acted "knowing[ly] and intentional[ly]" in failing to disclose material

information, and that the defendants "knew all of the facts" concerning HBOS's finances and

the ELA.  (Compl't ¶ 109; see also Compl't ¶¶ 126, 133-34, 146-47 (conclusory assertions

that defendants had direct knowledge of deteriorating  HBOS finances)).

        When proceeding with a recklessness theory of scienter, a complaint must

plausibly allege that defendants "'knew facts or had access to information suggesting that

their public statements were not accurate . . . .'"  Teamsters Local 445 Freight Div. Pensions

_____

[3] The only personal motive attributed to the defendants is that Daniels and Blank shared a "dream of heading up
what would be the largest bank in the UK, by far."  (Compl't ¶ 12.)  Though unsupported by any factual
allegations, such motivations common to corporate officers do not rise to the level of scienter.  ECA, Local 134,
553 F.3d at 198-99.

Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008) (quoting Novak, 216 F.3d at

311).  "Where plaintiffs contend defendants had access to contrary facts, they must

specifically identify the reports or statements containing this information." Novak, 216 F.3d at

309.

        The Complaint's scienter allegations consist solely of generalized averments

that draw no distinction between and among defendants.  Scienter may not be alleged through

group pleading.  See, e.g., Teamsters Allied Benefit Funds v. McGraw, 2010 WL 882883, at

*11 n.6 (S.D.N.Y. Mar. 11, 2010) (collecting cases).  There is, moreover, no allegation that

explains how, when and to what extent the defendants received information concerning

conditions at HBOS, including its liquidity problems or the extent of its holdings in troubled

assets.  It identifies no contemporaneous reports or statements that contain information

contrary to public disclosures.[4]  Novak, 216 F.3d at 309.  The scienter allegations appear

premised solely upon the individual defendants' positions within Lloyds, not fact-based

allegations of actual knowledge – let alone "strong circumstantial evidence" of recklessness.

ATSI, 493 F.3d at 99.

        Concerning the ELA, plaintiff argues that defendant Daniels testified before

the UK Parliament that he consciously elected not to disclose the ELA.  (Opp. Mem. at 20-21;

Edwards Dec. Ex. L at 7-8.)  Daniels testified that although Lloyds did not disclose that ELA

support totaled £25 billion, he believed that it nevertheless made adequate disclosure of

government financial assistance.  Daniels stated:

> What we disclosed was that there was emergency funding
> from the central bank, that it was substantial, that HBOS
> would not be able to function without it, so we believed that

---

[4] By way of contrast, the complaint in In re Bank of America Corp. Sec., Derivative, & Emp. Ret. Income Sec.
Act, 2011 WL 3211472, at *5-10 (S.D.N.Y. July 29, 2011), contained detailed allegations as to how and when
defendants learned of alleged losses within an acquired entity while the acquisition was pending.

> the investor could be left with no doubt as to the seriousness
> of the emergency lending.

(Edwards Dec. Ex. L at 7.)  In its November 3, 2008 shareholder circular, Lloyds stated that

"[i]n order to continue to meet their funding obligations," Lloyds and HBOS would continue

"access to the wholesale lending markets and Bank of England liquidity facilities and the UK

Government's guarantee scheme."  (Edwards Dec. Ex. F at 33.)  As previously quoted, the

HBOS prospectus of November 18, 2008 discussed UK government measures to inject

liquidity to the nation's financial institutions, including HBOS.  (Edwards Dec. Ex. K at 224.)

Thus, while Daniels's after-the-fact testimony may to Parliament have somewhat overstated

the explicitness of disclosures about government assistance, Lloyds contemporaneously

disclosed that both Lloyds and HBOS were using Bank of England "liquidity facilities" "to

continue to meet their funding obligations."  (Edwards Dec. Ex. F at 33.)  In light of such

statements, the Complaint cannot plausibly allege that defendants' failure to disclose specific

details of the ELA constituted "an extreme departure from the standards of ordinary

care . . . ."  Novak, 216 F.3d at 308 (quotation marks omitted).

> The Complaint fails to raise an inference of scienter that is "cogent and at least

as compelling as any opposing inference of nonfraudulent intent."  Tellabs, 551 U.S. at 314.

> III.     Plaintiff's Section 20(a) Claim is Dismissed.

> "In order to establish a prima facie case of liability under § 20(a), a plaintiff

must show: (1) a primary violation by a controlled person; (2) control of the primary violator

by the defendant; and (3) that the controlling person was in some meaningful sense a culpable

participant in the primary violation."  Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir.

1998) (quotation marks omitted).

Because the Complaint fails to plead a primary violation, the Section 20(a) claim is dismissed.

IV.     Entry of Judgment Is Appropriate.

In opposition to the motion to dismiss, plaintiff did not seek leave to amend the Complaint in the event that the defendants' motion is granted.  Even if he had, based on the procedural history of this action, leave to amend would not be warranted under Rule 15(a), Fed. R. Civ. P.

On February 13, 2012, defendants wrote to the Court setting forth the bases for a  proposed motion to dismiss.  (Docket # 10.)  In response, the Court issued an order stating that it would address the proposed motion's scheduling at a pretrial conference in March. (Id.)  The order also directed plaintiff to advise the Court "whether it wishes to amend to cure any purported deficiencies."  (Id.)  In a letter dated February 20, 2012, plaintiff wrote the Court stating that it wished to file an amended complaint "to formally respond to the alleged deficiencies" and "to dissuade Defendants from filing a motion to dismiss."  (Docket # 11.) The Court issued an order granting plaintiff leave to amend.  (Id.)

Following a pretrial conference on March 16, 2012, the Court issued an order noting that plaintiff had elected to amend his complaint, and set forth a briefing schedule for defendants' motion to dismiss.  (Docket # 25.)   Plaintiff filed his First Amended Complaint on March 19, 2012.  (Docket #24.)

Plaintiff has "already had one opportunity to plead fraud with greater specificity."  Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986).  In this instance, the plaintiff filed his amended complaint after reviewing the bases for defendants' proposed motion but failed to satisfy the pleading requirements of Rule 9(b) and the PSLRA.

CONCLUSION

      The motion to dismiss is GRANTED.  (Docket # 27.)  The Clerk is directed to

terminate the motion and enter judgment for the defendants.

      SO ORDERED.

_____

P. Kevin Castel
United States District Judge

Dated: New York, New York
      October 16, 2012

CONCLUSION

The motion to dismiss is GRANTED.  (Docket # 27.)  The Clerk is directed to terminate the motion and enter judgment for the defendants.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
October 16, 2012