**MANDATE**

N.Y.S.D. Case #
11-cv-8530(PKC)

12-4600-cv(L)
Ross v. Lloyds Banking Grp., PLC

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 19th day of September, two thousand thirteen.

PRESENT: JON O. NEWMAN,
REENA RAGGI,
GERARD E. LYNCH,
    *Circuit Judges.*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 6, 2013

-----------------------------------------------------------
ALBERT A. ROSS,

    *Plaintiff-Appellant*,

    v.

LLOYDS BANKING GROUP, PLC, f/k/a Lloyds TSB Group, PLC, SIR VICTOR BLANK, Chairman of Lloyds, ERIC DANIELS, Chief Executive of Lloyds,

    *Defendants-Appellees*.[*]
-----------------------------------------------------------

Nos. 12-4600-cv(L),
13-729-cv(Con)

---

[*] The Clerk of Court is directed to amend the official caption as shown above.

**MANDATE ISSUED ON 11/06/2013**

APPEARING FOR APPELLANT:   LORETTA GALLAHER MINCE, Fishman Haygood Phelps Walmsley Willis & Swanson, LLP, New Orleans, Louisiana.

APPEARING FOR APPELLEES:   DEREK J. T. ADLER (Sarah L. Cave, *on the brief*), Hughes Hubbard & Reed LLP, New York, New York.

Appeal from a judgment of the United States District Court for the Southern District of New York (P. Kevin Castel, *Judge*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court entered on October 17, 2012, is AFFIRMED.

Albert A. Ross, a purchaser of Lloyds Banking Group's ("Lloyds's") American Depository Receipts in the months leading up to Lloyds's acquisition of Halifax Bank of Scotland ("HBOS"), appeals from the dismissal of his amended complaint for failure to state a claim for securities fraud against Lloyds, its Chairman Sir Victor Blank, and its Chief Executive Officer Eric Daniels for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, see 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, see 17 C.F.R. § 240.10b-5.  Ross argues that the district court erred in concluding that (1) his complaint failed to allege actionable misstatements or omissions by defendants in connection with Lloyds's acquisition of HBOS, and (2) his control-person liability claim under § 20(a) failed in the absence of a properly pleaded primary violation under § 10(b) and Rule 10b-5.  Ross also challenges the district court's

denial of leave further to amend his complaint. We assume the parties' familiarity with the facts and record of prior proceedings, which we reference only as necessary to explain our decision to affirm.

1.   Securities Fraud Under Section 10(b) and Rule 10b-5

We review a Rule 12(b)(6) dismissal of a securities fraud claim de novo, accepting all factual claims in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). In evaluating such a dismissal, "we may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which [he] relied in bringing the suit." Id. To survive a motion to dismiss, a complaint alleging securities fraud must meet the heightened pleading requirements of both Fed. R. Civ. P. 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," and the Private Securities Litigation Reform Act ("PSLRA"), see 15 U.S.C. § 78u-4(b), which requires that scienter, i.e. a defendant's "intention to deceive, manipulate, or defraud," also be pleaded with particularity, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) (internal quotation marks omitted). To satisfy the PSLRA, a complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" ATSI Commc'ns, Inc.

v. Shaar Fund, Ltd., 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(2)). Moreover, that strong inference must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 324.

Ross failed to satisfy these pleading standards with respect to the three misstatements and one omission alleged in connection with Lloyds's acquisition of HBOS.

a.      Lloyds's Acquisition of HBOS

In considering whether Ross has satisfied the PSLRA, we consider "whether <u>all</u> of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 323 (emphasis in original). Here, Ross alleged that, beginning on September 18, 2008, the day Lloyds announced its agreement to acquire HBOS, defendants intentionally misled Lloyds's shareholders about HBOS's financial condition in order to coax them into approving the deal; only after the completed acquisition on January 19, 2009, did defendants slowly reveal HBOS's bleak financial state. These assertions do not plead an intent to deceive with particularity. Because it would hardly make economic sense for defendants to consummate an acquisition detrimental to Lloyds, a strong inference of fraudulent intent cannot be drawn simply from this timing. See Kalnit v. Eichler, 264 F.3d 131, 140–41 (2d Cir. 2001) ("Where plaintiff's view of the facts defies economic reason, it does not yield a reasonable inference of fraudulent intent." (alterations and internal quotation marks omitted)). Nor can a strong inference of intent to deceive be inferred from the contention that Daniels and Blank were

4

seeking to realize a longstanding desire to create a "superbank." First Amend. Compl. ¶ 10, J.A. 10 (internal quotation marks omitted). Even if defendants had such a goal, that hardly supports a strong inference that they acted with fraudulent intent. See ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.3d 187, 201 (2d Cir. 2009) ("Such generalized desires fail to establish the requisite scienter because the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired . . . ." (internal quotation marks omitted)). With this broader context in mind, we turn to the three alleged misstatements and one omission relied on by Ross to claim securities fraud.

    b.    <u>September 18, 2008 Statement that HBOS had £60 Billion in "Highly Liquid Near Cash" Reserves</u>

Ross claims that, during a September 18, 2008 conference call in which Lloyds announced to investment analysts its plan to acquire HBOS, "Defendants" falsely stated that HBOS would contribute £60 billion in "highly liquid near cash" reserves to the combined Lloyds/HBOS entity. First Amend. Compl. ¶ 54, J.A. 21 (internal quotation marks omitted).[1] Ross fails to plead facts sufficient to demonstrate falsity of this statement, much less an intent to defraud. Ross points to a 2011 letter from Lloyds's counsel to certain shareholders, which

---

[1] Ross acknowledges that this alleged misstatement is "technically deficient" under Rule 9(b), Appellant's Br. 18, insofar as his amended complaint attributes the statement to "Defendants," rather than to a specific individual. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d at 99 (stating that Rule 9(b) requires complaint to identify speaker).

5

states that HBOS's £60 billion in assets comprised government-issued debt, residential mortgages, and personal and commercial loans, a collection of assets that he submits could not be properly characterized as "liquid" or "near cash." But the transcript of the September 18, 2008 call makes clear that the terms "liquid" and "near cash" were being used to refer to government-issued debt. See Tr. of Sept. 18, 2008 Analyst Call, Supplemental J.A. 226 ("The £80 billion is made up of highly liquid, near cash. You are talking about Treasuries, Government bonds, highly liquid. We haven't generally got down to that, but it is roughly £60 billion coming from the HBOS, £20 billion Lloyds TSB."); id. (stating that "fair chunk" of £60 billion from HBOS is "existing Treasury assets"). Ross, therefore, cannot claim that the statement was false or misleading in that regard. As for the 2011 letter's reference to mortgages and loans, neither the letter nor any other pleading indicates that defendants were aware, prior to the September 18, 2008 call, that such assets were improperly included in the £60 billion figure that they described as highly liquid, near cash. See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008) ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." (internal quotation marks omitted)). Thus, there is no particular factual basis to support a strong inference that the September 18, 2008 statement was made with an intent to deceive, defraud, or manipulate.

To the extent Ross argues that HBOS's receipt of funding from the Bank of England's Emergency Liquidity Assistance ("ELA") program on October 1, 2008, proves that HBOS

did not have £60 billion in "highly liquid near cash" reserves on September 18, he fails to explain why that conclusion necessarily follows. He provides no basis for assuming that HBOS would not elect to pursue ELA funding despite its possession of £60 billion in reserves. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient."). Thus, the allegation regarding HBOS's receipt of ELA funding fails to raise a strong inference of defendants' deceitful intent.

    c.    <u>September 18, 2008 Statement that HBOS Had "Meaningful Incremental Available Assets for Submission" to the Bank of England's Special Liquidity Scheme</u>

Ross alleges that, also during the September 18, 2008 analyst call, Tim Tookey, Lloyds's Director of Finance, falsely stated that HBOS had "meaningful incremental available assets for submission" to the Bank of England's Special Liquidity Scheme ("SLS"). First Amend. Compl. ¶ 56, J.A. 21 (internal quotation marks omitted). According to Ross, AAA-rated assets were required as collateral for SLS funding, and if HBOS had such assets, it would not have resorted to funding from the Bank of England's ELA program on October 1, 2008, which did not require such high-quality assets, but charged a higher interest rate than the SLS. The conclusion that, on September 18, 2008, HBOS did not have assets that could be submitted to SLS is speculative. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d at 103–04 (rejecting reliance on speculative inferences). Ross pleads no facts indicating that HBOS's utilization of lower-quality assets to pursue ELA funding excluded the possibility

7

that it had superior assets that could have been submitted to SLS. Indeed, a contrary inference is supported by Ross's allegation that, on October 13, 2008, "Lloyds announced that it (and HBOS) planned to participate" in British government programs to assist banks, including SLS. First Amend. Compl. ¶ 14, J.A. 11; see id. at ¶¶ 61, 102, J.A. 16, 27. Tookey's statement, therefore, does not raise a strong inference of deceitful intent.

In urging otherwise, Ross relies on a 2012 report by the U.K. Financial Services Authority ("FSA"), which concluded that 75% of HBOS's Corporate Division loan portfolio was sub-investment grade from 2006 to 2008. But the significance of that report is limited by its scope: it speaks only to the quality of the assets held by HBOS's Corporate Division, not HBOS's assets as a whole. In any event, the report concludes only that a portion of the Corporate Division's assets were sub-investment grade; it does not conclude that the Corporate Division, or HBOS for that matter, had no assets of sufficient quality to submit to SLS, and thus it does not demonstrate the falsity of Tookey's statement.

Ross also points to (1) a November 25, 2009 statement by FSA Chairman Lord Turner in testimony before Parliament that "Lloyds executives were fully aware of the circumstances of HBOS," First Amend. Compl. ¶ 87, J.A. 29 (internal quotation marks omitted); and (2) a February 2010 statement by Daniels that HBOS was "pretty much taking liquidity at any cost at any duration," id. ¶ 77, J.A. 27 (internal quotation marks omitted). Because the first statement provides no detail regarding "the circumstances" of which Lloyds executives were fully aware, it lacks the particularity necessary to give rise to a strong inference of deceitful

intent. The second statement indicates that HBOS was willing to seek funding from any available source, which would include SLS and ELA sources. Thus, that statement fails to support a strong inference that Tookey's statement was intended to deceive.

        d.      <u>November 3, 2008 Statement that Lloyds Would Be "Acquiring About [£]30 Billion in Net Assets for About [£]14 Billion"</u>

Ross asserts that, during an analyst call on November 3, 2008, Daniels falsely stated that Lloyds would be "acquiring about [£]30 billion in net assets for about [£]14 billion." First Amend. Compl. ¶ 105, J.A. 34 (internal quotation marks omitted). Ross claims that HBOS's net assets were then valued at much less than £30 billion, as demonstrated by Daniels's 2010 testimony before Parliament, in which he stated that Lloyds understood that "the book value of [HBOS's] business was substantially inferior" and that was "in fact why [Lloyds] offered much less than book value." <u>Id.</u> ¶ 18, J.A. 12 (alterations in original; internal quotation marks omitted). Given that Lloyds acquired HBOS for less than 50% of the "book value" of its net assets, implicit in Daniels's November 3 statement is his view that those assets were "substantially inferior."

This implication was made explicit by additional information publicly disclosed on November 3, 2008. Specifically, while Lloyds's November 3 circular about its intended acquisition of HBOS indicated that HBOS's unaudited pro forma net assets were, in fact, worth £31.5 billion as of June 30, 2008, Lloyds also disclosed the possibility of material negative adjustments to that figure after the acquisition was completed. <u>See</u> Nov. 3, 2008

9

Circular, Supplemental J.A. 55.  Moreover, after Daniels indicated to analysts on the November 3 call that Tookey would "walk [analysts] through the math" relevant to his assertion, Tr. of Nov. 3, 2008 Analyst Call, Supplemental J.A. 134, Tookey explained that significant adjustments, up to £10 billion, would need to be made to the fair value of HBOS's balance sheet after Lloyds completed the acquisition of HBOS, see id. at 138.  In light of the fact that the fair value of HBOS's assets as of June 30, 2008, was approximately £30 billion, and that Lloyds disclosed on November 3 that substantial adjustments to that valuation were likely, Daniels's statement cannot be deemed misleading so as to raise a strong inference of scienter.  See Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.").

e. Disclosure of ELA Funding

Ross alleges that defendants avoided disclosing HBOS's acceptance of ELA funding on October 1, 2008, in order to mislead the market about HBOS's financial condition.  He asserts that such disclosures would have alerted the market to HBOS's dire financial condition.  Again, this is not enough to allege scienter.

Although Lloyds did not specifically disclose that HBOS had utilized ELA funding, Lloyds and HBOS made clear in the November 3 circular and in prospectuses issued on November 18, 2008, that they both had been dependent upon the Bank of England's liquidity facilities to meet their funding obligations and would be so dependent for the foreseeable

future. See, e.g., Nov. 3, 2008 Circular, Supplemental J.A. 57; HBOS's Nov. 18, 2008 Prospectus, Supplemental J.A. 189; Lloyds's Nov. 18, 2008 Prospectus, Supplemental J.A. 77. These broad disclosures preclude a strong inference that Lloyds's specific failure to state that HBOS had received ELA funding was intended to deceive, defraud, or manipulate. The more compelling inference is that Lloyds viewed its disclosures as sufficient to encompass the ELA funding, making a specific ELA disclosure unnecessary. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 324 ("[A] court must consider plausible, nonculpable explanations for the defendant's conduct . . . .").

Such a view cannot be deemed "an extreme departure from the standards of ordinary care" capable of establishing scienter through recklessness. Novak v. Kasaks, 216 F.3d at 308 (internal quotation marks omitted); see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d at 99 (stating that scienter may be established through "strong circumstantial evidence of conscious misbehavior or recklessness"). Because Lloyds disclosed the critical fact that HBOS was dependent upon government assistance to meet its funding obligations, plaintiff cannot plausibly allege that defendants "should have known that they were misrepresenting material facts" by not specifically identifying ELA as an HBOS funding source. Novak v. Kasaks, 216 F.3d at 308.

In sum, because Ross has failed to meet the heightened pleading requirements for securities fraud under Rule 9(b) and the PSLRA, the district court correctly dismissed his § 10(b) and Rule 10b-5 claims.[2]

2. <u>Control-Person Liability under Section 20(a)</u>

Ross alleges that the district court erred in dismissing his § 20(a) control-person liability claims against Blank and Daniels. "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d at 108. As Ross has failed adequately to plead a primary violation under § 10(b) and Rule 10b-5, his control-person liability claims cannot be sustained. Thus, the district court correctly dismissed those claims.

---

[2] Because we conclude that Ross has failed adequately to plead scienter with respect to the three misstatements and one omission that he alleges, we need not address his arguments regarding the materiality of the misstatements and omission. See <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d at 99 (stating that plaintiff must adequately plead scienter to survive motion to dismiss). We also need not address defendants' contentions that Ross failed adequately to plead loss causation or that his complaint is barred by the statute of limitations. We note, however, that Ross did not adequately plead that Lloyds's nondisclosure of ELA funding caused a loss in view of the fact that the price of Lloyds's American Depository Receipts increased the day after disclosure of that funding.

3. Leave to Amend

Ross contends that the district court improperly denied him leave to amend his complaint a second time, a claim we review only for abuse of discretion. See id. at 108. District courts "typically grant plaintiffs at least one opportunity to plead fraud with greater specificity." Id. Because Ross was afforded, and took advantage of, that opportunity, and because he points to no additional facts that he could allege to cure the deficiencies identified in his amended complaint, we conclude that the district court did not abuse its discretion in denying leave to amend a second time. See Acito v. IMCERA Grp., Inc., 47 F.3d 47, 55 (2d Cir. 1995) ("One good reason to deny leave to amend is when such leave would be futile.").

We have considered Ross's remaining arguments on appeal and conclude that they are without merit. The judgment of the district court is AFFIRMED.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit